626 P.2d 280

**BANK OF NEW MEXICO,**
Plaintiff-Appellee,

v.

**NORTHWEST POWER PRODUCTS,**
INC. et al., Defendants-Appellees,

v.

Joe PRIESTLEY and Charles Nuckols,
Corona, Ltd., a New Mexico Corpora-
tion, Garnishees-Appellants.

**CATE EQUIPMENT COMPANY,**
Plaintiff-Appellee,

v.

Richard K. MULVANEY and Joe W.
Roberts, Defendants-Appellees.

Joe W. ROBERTS, Third Party
Plaintiff-Appellee,

v.

CORONA, LTD., Charles Nuckols and
Joe Priestley, Third Party
Defendants-Appellants.

No. 4200.

Court of Appeals of New Mexico.

Aug. 19, 1980.

Robert H. Clark, Michael Wile, Keleher & McLeod, P. A., Albuquerque, for appellee Bank of N. M.

Lynn Pickard, Pickard & Singleton, Santa Fe, William Darling, Albuquerque, for garnishees-appellants.

## OPINION

SUTIN, Judge.

The Bank of New Mexico sued Corona, Ltd., Joe Priestley and Charles Nuckols, as garnishees, to enforce any indebtedness that the garnishees owed to Joe W. Roberts, the Bank's judgment debtor. The garnishees counterclaimed for rescission and damages.

Cate Equipment Company brought suit against the Carico Lake Mining Company and its constituent partners, Joe Roberts and Richard M. Mulvaney, for the cost of work done on the company's equipment. Roberts claimed indemnification from the garnishees for this debt.

The suits were consolidated. Following a non-jury trial,

(1) the Bank was granted judgment against the garnishees, Corona, Ltd., a New Mexico Corporation, Priestley and Nuckols jointly and severally, in the amount of $127,595.06 with interest, plus costs and attorney fees in the sum of $12,759.00;

(2) Roberts was granted judgment for indemnification on his third party complaint against the same garnishees, jointly and severally, in the sum of $5,520.00 plus interest;

(3) the counterclaims of the garnishees were dismissed;

(4) Cate Equipment Co. was awarded judgment against Roberts on an open account in the total aggregate of $6,202.96;

(5) Cate was awarded judgment against garnishees in the sum of $18,469.63 with interest and attorney fees pursuant to paragraph 7 of the Agreement dated February 18, 1977.

The garnishees only appealed.

We reverse as to the individual liability of Priestley and Nuckols as garnishees; affirm the judgment of the Bank against Corona, Ltd.; affirm as to the dismissal of garnishees' counterclaim for rescission and damages; and affirm Roberts' judgment for indemnification. We reverse Cate's judgment against the garnishees.

The trial court made 32 findings of fact and 8 conclusions of law, summarized as follows:

In 1974, Roberts, Mays and Mulvaney, as partners, acquired Carico Lake Mining Company as a working turquoise mine in Nevada. Its home office was in Albuquerque. Ultimately, Roberts and Mulvaney each owned a one-half interest in the partnership. In June 1976, the partnership gave Priestley, a real estate broker, an exclusive listing to sell the mine and business. A rift developed in the partnership. Priestley, aware of this rift, joined with Nuckols to negotiate the purchase of Roberts' one-half interest.

An agreement was executed on February 18, 1977. Corona, Ltd. purchased Roberts' one-half interest and made a $10,000.00 down payment. Priestley and Nuckols joined in the agreement, and, along with Corona, executed a promissory note for $122,595.06. The garnishees knew that the mine had been shut down for several months. No inventory was included in the sale. Priestley and Nuckols contracted with Mulvaney to purchase his half of the inventory. Mulvaney became impatient with Priestley and Nuckols and eventually ousted them from the home office in Albuquerque. Thereafter, Mulvaney refused to accept Priestley and Nuckols as partners but Mulvaney's conduct did not constitute a failure of consideration on the part of Roberts.

On July 21, 1977, by letter, Corona sought to rescind the Roberts' agreement and to void the guarantees of Priestley and Nuckols on the promissory note, but Corona did not comply with the contract provisions. Roberts rejected the rescission and demanded payment of the note. Roberts did not breach the agreement nor make any misrepresentations. Other than the down payment of $10,000.00 no payments were made by garnishees on the promissory note or contract.

Garnishees had made an investigation of the mine prior to its purchase. In fact, they owned other contiguous mining claims prior to the purchase of Roberts' interest in the mining company. Garnishees suffered no loss on accounts payable assumed and did not properly notify Roberts of any alleged discrepancies under the contract. Inasmuch as there was no significant deficiency in those matters set forth under paragraph 6 of the agreement, the individual guarantees were not void or voidable.

In making the sale of his partnership interest to Corona, Ltd., Roberts did not violate the Federal Securities Laws or the Securities Act of New Mexico.

With reference to the claims of Cate Equipment Company, the court found that Cate was notified and recognized the limitation, that Mulvaney was authorized to bind the partnership only to the extent of $5,000.00. Roberts never authorized the charges of Cate's claim, but the garnishees were liable to the extent that partnership assets exist, pursuant to paragraph 7 of the Agreement. Roberts can be liable to Cate for $5,000.00, but Roberts was entitled to indemnification from garnishees for this amount.

The garnishees were not entitled to rescission of the 1977 Agreement, nor any award of damages from Roberts; the Bank was entitled to judgment against garnishees jointly and severally, in the amount of $127,596.06 with interest, plus costs and attorney fees of $12,759.00.

The court concluded that the garnishees were not entitled to rescission of the contract dated February 18, 1977; that Priestley and Nuckols were liable on the note; that the counterclaims of garnishees should be dismissed; that the Bank of New Mexico was entitled to judgment against the garnishees; that Cate was entitled to judgment against Roberts and the garnishees, and Roberts was entitled to judgment against the garnishees for indemnification.

### A. *Priestley and Nuckols were not personally liable on the contract.*

■ Two judgments were awarded against Priestley and Nuckols under the 1977 contract: (1) Cate Equipment Company was awarded judgment against garnishees in the sum of $18,469.63, pursuant to paragraph 7 of the Agreement of February 18, 1977. Paragraph 7 provided that Carico Lake Mining Company would hold Roberts harmless on account of the indebtedness due Cate which was $18,469.63; (2) Roberts was awarded judgment against garnishees in the sum of $5,520.00.

Both judgments arose out of the 1977 Agreement wherein Roberts sold his one-half partnership interest to Corona, Ltd., a corporation, in which Priestley and Nuckols were officers, directors, and shareholders. Priestley and Nuckols were not parties to this purchase Agreement. They did sign the agreement in their individual capacities. They appear by name in paragraph 2 in which the promissory note payable to Roberts "shall bear individual guarantees of P–N (Priestley-Nuckols)," and in paragraph 6 wherein provision is made for an avoidance of the note.

In order to hold Priestley and Nuckols liable, Cate and Roberts had to pierce the corporate veil and establish that Corona, Ltd. was the alter ego of these defendants. *Scott Graphics, Inc. v. Mahaney*, 89 N.M. 208, 549 P.2d 623 (Ct.App.1976). This, they failed to do.

Roberts knew he was dealing with a corporation. In bargaining and dealing with Priestley and Nuckols, he only obtained from them their personal guarantees on the note. Under these circumstances, Priestley and Nuckols were not personally liable to Cate Equipment Company or Roberts by reason of the 1977 Agreement.

The Bank's garnishment proceedings and Cate Equipment Company judgment can not be enforced against Priestley-Nuckols upon either of these judgments.

### B. *Priestley and Nuckols were relieved as guarantors of the promissory note.*

Paragraph 6 of the Agreement reads:

*The individual guarantees of the promissory note by P–N (Priestley-Nuckols) shall become void under the following conditions* : If within six (6) months from the date of this Agreement there shall be discovered a deficiency in accounts receivable and equipment inventory, or an overage in accounts payable, with a net diminution of assets to the extent of Five Thousand Dollars ($5,000.00), unless said deficiency shall be reimbursed by ROBERTS, within thirty (30) days written notice of same.

As precisely written, this paragraph says: If Corona, Ltd. discovers a deficiency with a net diminution of assets to the extent of $5,000.00, written notice of the discovery must be given to Roberts. Within 30 days thereafter Roberts *shall* reimburse the deficiency discovered. If reimbursement is *not* made by Roberts, the individual guarantees of the promissory note by P–N *shall* be void.

On July 21 1977, within six months of the date of the Agreement, Corona, Ltd. notified Roberts by letter, that the purchase agreement was rescinded. Demand was made for return of the $10,000.00 down payment, and the promissory note was repudiated. One paragraph of the letter reads:

3. There are major discrepancies in the accounts payable and accounts receivable for an estimated diminution in the assets of the corporation of at least $7,447.96. (In accordance with Paragraph 6 of the Agreement, the personal guarantees of Joe Priestley and Charles

Nuckols on the promissory note are hereby declared to be void.)

On July 26, 1977, Roberts, by letter, rejected the notice given. It demanded full compliance by Corona, Ltd., Priestley and Nuckols.

The trial court found:

(11) * * * In attempting to rescind the Agreement and void the guaranties Corona, Priestley and Nuckols did not comply with appropriate provisions in the Agreement.

\* \* \* \* \* \*

(20) * * * Roberts were never properly notified pursuant to the terms of the Contract of any alleged discrepancies.

(21) The Court finds that there existed no significant deficiency in accounts receivable, equipment, inventory or an overage in accounts payable under Paragraph 6 of the Agreement dated February 18, 1977. Accordingly, there was no net diminution of the assets purchased by Corona and therefore the individual guaranties of Priestley and Nuckols are not void or voidable.

These findings are not consonant with paragraphs 2 and 6 of the Agreement. The notice given was in compliance with those provisions of the Agreement.

The error committed below and carried forward in this appeal arises out of the mistaken belief that Priestley-Nuckols were parties to the 1977 Agreement and bound by its terms and conditions. This fact is not supported by any evidence.

"To rescind the contract and void the guarantees," Priestley-Nuckols, in their individual capacities, were under no duty to comply with any provisions of the contract. Corona, Ltd. purchased Roberts' one-half partnership interest. It alone had to comply with the provisions of the Contract. True, Corona, Ltd. could not declare the guarantees void prior to reimbursement by Roberts, but his rejection of the notice, and his failure to reimburse Corona, Ltd. effectively voided the guarantees. Roberts had a choice to make. He could either reimburse Corona, Ltd. or void the guarantees. He chose the latter.

To "discover a deficiency," Corona checked with debtors and creditors listed in the Agreement. Upon discovery of the deficiency, Corona, Ltd. gave notice to Roberts. Pursuant to paragraph 6, supra, "said deficiency shall be reimbursed by ROBERTS, within thirty (30) days written notice of same."

When Corona, Ltd. gave Roberts notice of an "estimated diminution in the assets of the corporation of at least $7,447.96," Roberts was compelled to pay this amount in reimbursement or waive his right to hold the guarantors liable. Whether there was substantial evidence to support the diminution of assets was irrelevant to the voidance of the guarantees.

The 1971 Agreement made no provision for the guarantors to set forth the details of the discovery, nor an explanation of the basis upon which the deficiency or diminution of assets existed. Any bargaining or dealing over the asserted diminution had to take place between Corona, Ltd. and Roberts, not the guarantors. The assets were owned by Corona, Ltd. The loss or diminution thereof was suffered by Corona, Ltd. The notice was given by Corona, Ltd.

A guarantor is a favorite of the law. He is entitled to a strict construction of his undertaking. He cannot be held liable beyond the strict terms of his contract. Neither can his liability be extended beyond the express limits or terms of the instrument, or its plain intent. *Shirley v. Venaglia,* 86 N.M. 721, 527 P.2d 316 (1974). We are not involved with an unconditional guarantee of payment. *American Bank of Commerce v. Covolo,* 88 N.M. 405, 540 P.2d 1294 (1975). The guarantee was conditioned upon a discovery of a deficiency and reimbursement by Roberts. The conditions being unfulfilled, the guarantors were not liable.

To support the court's findings, the Bank, like the court, substituted Priestley-Nuckols for Corona, Ltd. as though they were the *alter ego* of Corona, Ltd. It also argues that a valid rescission of the contract deter-

mined the guarantors' freedom from liability. We disagree.

The Bank's first position in this appeal was that "Piercing of the corporate veil is not an issue on this appeal." Yet throughout its argument on this point, the Bank has claimed that the notice of rescission was a Priestley-Nuckols letter; that Priestley-Nuckols failed to comply with the terms of the agreement; that Priestley-Nuckols failed to prove a factual predicate for the purported rescission.

The notice letter was not a Priestley-Nuckols letter. The guarantors had no power to rescind the purchase agreement, return to Roberts his partnership interest or demand return of the $10,000.00 down payment. The notice letter was written by attorneys for Corona, Ltd. on behalf of Corona, Ltd. No duties or responsibilities were imposed upon the guarantors of the promissory note. Whether they wanted or intended that Roberts reimburse Corona, Ltd. their liability or freedom therefrom depended on whether Roberts reimbursed Corona, Ltd. When Roberts rejected the notice given by Corona, Ltd., he effectively released the guarantors from liability.

Neither are the guarantors concerned with Corona, Ltd.'s notice of rescission of the contract. The Bank's extensive discussion of what constituted a valid rescission of a contract was irrelevant to the issue of whether the guarantors were relieved of liability. Rescission of the Corona-Roberts agreement and the guarantors relief from liability on the promissory note are separate and distinct remedies available to Corona, Ltd. and Priestley-Nuckols. Corona, Ltd. can be liable on the contract and yet Priestley-Nuckols relieved as guarantors.

The Bank was not entitled to enforce garnishment proceedings against Priestley and Nuckols individually for any amount owed to Roberts by Corona, Ltd.

### C. *Corona, Ltd. was not entitled to rescission of the 1977 Agreement.*

The trial court found (1) that Roberts did not breach the Agreement of February 18, 1977, and that grounds to rescind that Agreement did not exist; (2) that Roberts made no material misrepresentations with respect to the financial condition of the business or the validity of its accounts receivable; (3) that Roberts made no material misrepresentation with respect to the quality or quantity of minerals located in the mine; (4) that Roberts made no material misrepresentation as to the accounts payable; (5) that under paragraph 6 of the Agreement there existed no significant deficiency in accounts receivable, inventory or an overage in accounts payable; (6) that Roberts unwittingly violated paragraph 4(j) of the Agreement but it was not prejudicial to garnishees; and (7) that there was no failure of consideration on the part of Roberts because Mulvaney refused to accept Corona, Ltd. as a partner.

In discussing Corona, Ltd.'s reasons for its right to rescission of the Agreement, we must keep in mind that Corona, Ltd. did not purchase or own any inventory in the Carico Lake Mining Company; that Carico Lake Mining Company never mined any products, and that Roberts made no representations or warranty as to the grade, quality or amount of turquoise. What Corona, Ltd. sought to do immediately and primarily was to syndicate the property to get money invested in it in order to take care of obligations owed. A separate limited partnership for this purpose was set up and approved by the State Banking Commission.

When questioned: "What happened that caused you to decide to want to rescind this contract that you had entered into?", Priestley answered:

Well things just started happening. Number one, I had heard that Mr. Roberts had sold a large quantity of turquoise to Bien Muir. I had those charts checked out and it looked like there wasn't the same amount of turquoise that was shown on those charts. I didn't know, it was just one thing after another, that it just got to be a "big can of worms," is what it became.

The reasons given do not warrant a rescission of the contract.

On June 3, 1977, three and a half months after the Agreement was executed, Roberts sold a little over 5000 pounds of turquoise to Bien Muir Indian Market Center, Inc. for the sum of $31,900.00. This sale constituted a violation of paragraph 4(j) of the Agreement. But the court found that since "Carico Lake (Mining Company) had no inventory and was not operating the mine it consequently suffered no measurable loss * * * ", that "the alleged violation of paragraph 4(j) of the Agreement does not give grounds to rescind the Contract." We agree. A rescission is not warranted by a mere breach of contract that is not so substantial and fundamental as to defeat the object of the parties. The breach must be prejudicial and go to the root of the contract. *Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co.*, 69 N.M. 281, 365 P.2d 925 (1961). In other words, Corona, Ltd. had to prove that the sale was a substantial and fundamental breach of the contract. *Montgomery v. Cook*, 76 N.M. 199, 413 P.2d 477 (1966). This Corona, Ltd. could not do. It had nothing to sell. Neither it nor Carico Lake had any inventory. To the contrary, the Roberts' sale may have retained Bien Muir as a potential customer of Corona, Ltd.

With reference to the amount of turquoise shown on charts, paragraph 8 of the Agreement reads:

ROBERTS make no representation or warranty as to the grade, quality or amount of turquoise * * * except which is contained herein.

Corona, Ltd. cannot rely upon "amount of turquoise" to rescind the contract.

Corona, Ltd. now claims that Roberts misrepresented the percentage interest he held in the Carico Lake Mining Company. Paragraph 1 of the Agreement states that Roberts owns a 50% interest. It was this interest that Corona, Ltd. purchased. However, Rogers had taken $30,000.00 out of his capital account, verified by his 1976 tax return. Neither in Corona's letter of rescission of July 21, 1977, nor at trial, did Corona, Ltd. rely upon this factor for rescission. Nevertheless, in the February 18, 1977 Agreement, also signed by Mulvaney, it was stated that " 'Carico Lake Mining Company' is beneficially owned fifty percent (50%) ROBERTS and fifty percent (50%) RKM (Mulvaney)." This Agreement was executed following the 1976 tax return of Rogers and Mulvaney.

Paragraph 10 of the Agreement reads:

That upon execution hereof RKM agrees to release ROBERTS of all claims which have arisen or may have arisen to the date of this Agreement, *provided, however, that this does not constitute a waiver as to any imbalance of partnership capital accounts of ROBERTS and RKM.* [Emphasis added.]

Corona, Ltd. cannot now question the imbalance in the capital accounts when it knew of it and executed the contract. Furthermore, this imbalance did not prevent Mulvaney from covenanting that he and Roberts each had a 50% interest in the partnership. Nevertheless, Corona, Ltd. and Mulvaney would have shared equally in any profits.

We have carefully reviewed the other claims of misrepresentation by Rogers. A detailed explanation would not serve any useful purpose. The findings of the trial court are sustained by the evidence. Corona, Ltd. was not entitled to rescission of the Agreement of February 18, 1977.

The Bank of New Mexico had the right to enforce garnishment proceedings against Corona, Ltd. for the amount Corona, Ltd. owed Roberts.

D. *There was substantial evidence to support award of $127,595.06 and attorney fees in favor of Bank against Corona, Ltd.*

The Bank was entitled to judgment against Corona, Ltd. in the sum of $122,595.06 on the promissory note. The court found that "Roberts is entitled to indemnification from * * * Corona for the full extent of said $5,000.00" based upon Rogers' liability to Cate. The court added this $5,000.00 for the amount stated in the promissory note. This finding and conclusion are affirmed.

E. *Cate was erroneously awarded judgment against Corona, Ltd.*

The court found:

Priestley, Nuckols and Corona are liable for the debt to Cate Equipment *to the extent that partnership assets exist*, pursuant to Paragraph 7 of the Agreement. Mulvaney retained approximately $50,000.00 worth of partnership assets and no evidence has been introduced to indicate that these assets do not presently exist. [Emphasis added.]

This opinion does not disturb any rights that Cate has against any partnership assets retained by Mulvaney.

The court concluded that the amount to be awarded Cate was $18,469.63 plus interest and attorney fees "to the extent that partnership assets exist."

We have heretofore held that Priestley-Nuckols were exonerated of any liability.

Cate is not represented by legal counsel in this appeal.

Under paragraph 7 of the Agreement, Carico Lake Mining Company agreed to hold Roberts harmless on account of the indebtedness due Cate in the sum of $18,468.63. When Roberts left the partnership, the Carico Lake partnership agreed to relieve Roberts of any liability for the money due Cate. On June 28, 1977, some four months thereafter, Cate sued Mulvaney and Roberts, d/b/a Carico Lake Mining Co., for $18,469.63. Following this action, judgment was entered in the instant case that Cate have judgment against Corona, Ltd. "to the extent that Partnership, assets of Carico lake Mining Company exist * * * *."

The final judgment makes it clear that the finding and conclusion of the court did not mean existent assets belonging to the individual partners. It meant assets belonging to Carico Lake Mining Co. By statute, the liability of Corona, Ltd., admitted as a partner into the existing partnership, "shall be satisfied" only out of Carico Lake Property. Section 54–1–17, N.M.S.A.1978. If there is partnership property upon which Cate can execute in satisfaction of the judgment, the statute allows Cate to do so.

There was no evidence that property of the Carico Lake partnership existed as partnership property at the time of trial. Gary Mays, an original partner, testified that as part of securing his payment for his share of the prior partnership, he took possession of all equipment, both in Albuquerque and Nevada; that he bought the mine himself and sold the Nevada equipment; that he could find no equipment in New Mexico because Mulvaney ended up with it. Even if it was not Mulvaney's own property, it belonged to Mays.

Inasmuch as there were no assets of Carico Lake Mining Co. in existence, the judgment of Cate against Corona, Ltd. is reversed.

F. *Garnishees were entitled to costs and attorney fees in trial court and appeal.*

Garnishees requested an award of costs and attorney fees in the trial court pursuant to the garnishment proceedings. This request was denied.

Section 35–12–16(B), N.M.S.A.1978 reads:

If the garnishee answers as required by law, the court shall award the garnishee his actual costs and a reasonable attorney fee. The award shall be against the defendant if the plaintiff prevails and against the plaintiff if the garnishee prevails.

The word "shall" is mandatory. Section 12–2–2(I), N.M.S.A.1978. The garnishees answered as required by law. Each garnishee must be awarded actual costs expended and a reasonable attorney fee. Unfortunately, the statute does not describe the extent of the attorney fee. Does it cover solely the filing of an answer? Does it extend to a controverted proceeding and to an appeal?

Section 26–2–31, N.M.S.A.1953, the former statute on costs and attorney fee for garnishee, reads:

The costs of the proceeding, including a reasonable attorney's fee for the garnishee, shall be taxed as in ordinary suits against the plaintiff or defendant, or both.

Under this statute, it was the understanding of the Supreme Court "that attorney's fees are allowed a garnishee to reimburse him for the cost of filing an answer *and appearing in the trial court if his answer be controverted.*" [Emphasis added.] *Mendoza v. Acme Transfer & Storage Co.*, 66 N.M. 32, 36, 340 P.2d 1080 (1959). In *Mendoza*, the garnishee was allowed costs in the appeal but no reference was made to appellate attorney fees.

Under the former statute, a reasonable attorney fee was assessed as costs. Under the present statute, it is not.

The Bank issued a Writ of Garnishment to each of the garnishees. Each answered that no indebtedness was due to any of the defendants, which included Roberts. The Bank controverted each of the answers filed and requested a trial on the merits. As a result, each of the garnishees became parties to the garnishment proceedings.

*First*, unquestionably, each of the garnishees are entitled to an award of actual costs and a reasonable attorney fee for each answer filed.

*Second*, under *Mendoza*, each garnishee is entitled to an award for actual costs and reasonable attorney fee for services rendered in the controverted proceedings in the district court. *Bolten v. Colburn*, 389 S.W.2d 384 (Mo.App.1965); *Carter v. Leiter*, 476 S.W.2d 461 (Tex.Civ.App.1972); *Luger v. Windell*, 123 Wash. 279, 212 P. 276 (1923); *McPike Drug Co. v. Wilson*, 237 S.W. 1044 (Mo.App.1922).

Priestley and Nuckols are entitled to a reasonable attorney fee from the Bank for services rendered in the trial. Corona, Ltd. is entitled to a reasonable attorney fee from Roberts.

*Third*, the statute is not limited to services of a lawyer in the trial court. It includes services rendered in the appellate court. *Lincoln Loan Service v. Motor Credit Co.*, 83 A.2d 332 (Ct.App.D.C.1951); *Casray Oil Corporation v. Royal Indemnity Co.*, 165 S.W.2d 244 (Tex.Civ.App.1942). In *Casray*, this issue became moot on appeal to the Supreme Court and the case was affirmed, 141 Tex. 33, 169 S.W.2d 955 (1943). We agree with *Casray* that "This court will jealously guard the right of all litigants to appeal." [165 S.W.2d 250.]

A dispute does exist as to whether the appellate court or the trial court shall determine the amount of attorney fees to be awarded for appellate services. See, *International Security Life Insurance Co. v. Spray*, 468 S.W.2d 347 (Tex.Supp.1971) for the dispute in the courts. *Linclon Loan Services* and *Casray* hold that the award of an attorney fee is a fact issue to be passed on by the trial court.

In New Mexico Workmen's Compensation cases, the amount of the appellate attorney fee is fixed by the appellate court.

We believe it is better to allow the trial court to determine the amount of attorney fees to be paid garnishees in accordance with the guidelines set forth in *Fryar v. Johnsen*, 93 N.M. 485, 601 P.2d 718 (1979).

We hold that Priestley and Nuckols are entitled to an award of a reasonable attorney fee and actual costs expended to be paid by the Bank for services rendered in the filing of an answer to the Writ of Garnishment, and for the trial and appeal of the garnishment proceedings.

Corona, Ltd. is entitled to the same relief from Roberts.

We affirm the dismissal of garnishees' counterclaim for rescission and damages. We affirm the judgment awarded the Bank against Corona, Ltd., and Roberts' judgment against Corona, Ltd. for indemnification.

We reverse the judgment of the Bank against Priestley and Nuckols on their individual liability on the Roberts' promissory note, the judgment of Cate Equipment Company against Priestley, Nuckols and Corona, Ltd., and the judgment awarded Roberts against Priestley and Nuckols for indemnification.

We reverse the failure of the trial court to award garnishees reasonable attorney fees and actual costs expended both in the trial court and this Court. The court shall hold a hearing and award a reasonable at-

torney fee to each of the garnishees. The attorney fee of Priestley and Nuckols shall be paid by the Bank. The attorney fee for Corona, Ltd. shall be paid one-half by Roberts and one-half by Cate Equipment Company. The actual costs expended in this appeal shall be paid by the Bank.

IT IS SO ORDERED.

LOPEZ, J., concurs.

HERNANDEZ, J., dissents.

HERNANDEZ, Judge (dissenting).

I dissent as to part "A" and "B" of the majority opinion.

To understand my disagreement with the majority it is necessary to set forth the preamble and some of the terms of the agreement between the appellants and Mr. and Mrs. Roberts and part of the promissory note executed simultaneously with the agreement.

The preamble reads as follows:

Agreement executed this 18th day of February, 1977, between JOE W. ROBERTS and JANICE E. ROBERTS, his wife, hereinafter referred to as "ROBERTS" and CORONA, LTD., a New Mexico corporation, hereinafter referred to as "CORONA", and JOE W. PRIESTLY and CHARLES E. NUCKOLS, hereinafter referred to as "P–N".

Paragraph 2 reads, in part, as follows:

Roberts are willing to sell their fifty percent (50%) partnership interest to Corona for One Hundred Twenty-two Thousand Five Hundred Ninety-five Dollars and six cents ($122,595.06), payable Ten Thousand Dollars ($10,000.00) upon the execution of this Agreement * * * Said obligation shall be represented by a promissory note payable to Roberts and shall bear individual guarantees of P–N. A copy of said promissory note is attached hereto as Exhibit "B" and incorporated herein by reference.

In the event of the default on any monthly installment or otherwise, continuing for a period of thirty (30) days after written notice the entire balance, including interest, shall become due and payable at the option of Roberts.

Paragraph 6 provides:

The individual guarantees of the promissory note by P–N shall become void under the following conditions: If within six months from the date of this Agreement there shall be discovered a deficiency in accounts receivable and equipment inventory, or an average in accounts payable, with a net diminution of assets to the extent of Five Thousand Dollars ($5,000.00), unless said deficiency shall be reimbursed by Roberts, within thirty (30) days written notice of same.

Paragraph 13 provides in part:

Any notices required hereunder shall be mailed to the following addresses:

    *     *     *     *     *     *

Joe W. Priestley
P. O. Box 8
Corrales, New Mexico 87048
Charles E. Nuckols
P. O. Box 3829
Albuquerque, New Mexico 87110

The agreement was signed by Priestley and Nuckols individually without any qualifying language. The promissory note which was incorporated into the agreement by reference provides in pertinent part:

After date, as hereinafter set forth, for value received, I, we, or either of us, promise to pay to JOE W. ROBERTS and JANICE E. ROBERTS his wife, at Albuquerque, New Mexico, the sum of One Hundred Twenty-Two Thousand Five Hundred Ninety-five Dollars and Six Cents ($122,595.06) in manner following, that is to say: One Thousand Five Hundred Dollars ($1,500.00) on the 18th day of August, 1977, and One Thousand Five Hundred Dollars ($1,500.00) on the 18th day of each and every month thereafter until the entire balance hereof with the interest thereon, as hereinafter set forth, shall have been fully paid.

    *     *     *     *     *     *

The makers reserve the right to pay two or more installments at anytime.

---

JOE W. PRIESTLEY,
individually

---

CHARLES E. NUCKOLS,
individually

CORONA LTD.
A New Mexico corporation

By _____
JOE W. PRIESTLEY, Pres.

It is my opinion that the agreement, insofar as Priestley and Nuckols were concerned, was that of "suretyship" as distinct from "guaranty".

Traditionally, the surety's undertaking and resultant obligation, is direct; and as to the creditor, primary; i. e. "I will pay." It is usually, though not necessarily, made jointly or jointly and severally with the principal, at the same time and for the same consideration. But it may be made after the principal became bound if based upon a new consideration, as where S promises C to pay P's debt if C will extend maturity. On the other hand guaranty is a secondary obligation, created by a promise expressly conditioned upon the principal's default, and necessarily is a separate undertaking from that of the principal. It also may be based upon the same consideration that supports the principal's promise, as where S contracts with C: "Sell goods to P and if P does not pay you, I will." L. Simpson, Handbook on the Law of Suretyship (1950). § 14, p. 16.

Guaranty is distinguishable from suretyship in that the former is a collateral and independent undertaking creating a secondary liability, while the latter is a direct and original undertaking under which the obligor is primarily and jointly liable with the principal. 38 C.J.S. Guaranty § 6(b), p. 1136.

A guaranty "imports the existence of two different obligations—one being that of the principal debtor, and the other that of the guarantor"; the "undertaking of the former is independent of the promise of the latter; and the responsibilities which are imposed differ from those created by the contract to which the guaranty is collateral." *Coombs v. Heers*, 366 F.Supp. 851 (D.C.Nevada 1973).

Priestley and Nuckols are classified as parties in the preamble. Their signatures to the agreement and the promissory note are unqualified; that is, their signatures are not followed by any qualifying language to indicate that they signed in any special capacity. Granted that paragraph 2 of the agreement contains this sentence, "Said obligation shall be represented by a promissory note payable to Roberts and shall bear individual guarantees of P–N [Priestley and Nuckols]." The use of the term "guarantees" does not alter their status as sureties in my opinion.

"The words 'guaranty' or 'guarantee' do not always import a contract of guaranty." Rather such words may be used with reference to an obligation which is primary in nature as distinguished from one which is secondary. *Roberts v. Reynolds*, 212 Cal.App.2d 818, 28 Cal.Rptr. 261 (1963).

There was but one agreement and Priestley and Nuckols are bound by its terms and conditions as is Corona, Ltd. There was but one debt and Priestley and Nuckols are directly and primarily responsible together with Corona, Ltd., to pay it.

Experience has demonstrated that the most prudent business men occasionally sustain loss because a debtor does not pay as he agreed or an employee turns out to be dishonest. To guard against such loss, various forms of security have been devised. Frequently the debtor mortgages or pledges his property. The effect of either is to give to the creditor a sure means of payment to the extent of the value of the property mortgaged or pledged, inasmuch as the creditor may cause it to be sold, if the debtor defaults, and apply the proceeds to the payment of his claim. If the principal cannot provide suitable security of this sort, he induces some person, believed by the creditor or employer to be responsible, to add his promise to the creditor. The effect of the surety's promise is to give the creditor recourse for payment to two persons instead of one, thereby materially decreasing his risk of loss. . . . average prudence will not save him. This is the basic function of the surety's promise and should always be borne in mind in the

solution of the difficult problems that arise where the surety seeks to avoid payment. L. Simpson, Handbook on the Law of Suretyship (1950) § 1, p. 2.

As can be seen, paragraph 6 of the agreement provided that Priestley and Nuckols could rescind their obligation to pay if there was a deficiency in the accounts receivable and equipment inventory, or an average in accounts payable amounting to $5,000 "unless said deficiency shall be reimbursed by Roberts, within thirty (30) days written notice of same." On July 21, 1977, Corona, Ltd. through its attorneys sent the following letter to Mr. and Mrs. Roberts:

> You are hereby notified that our client, Corona, Ltd., a New Mexico corporation, hereby rescinds that purchase agreement dated February 18, 1977, whereby Corona, Ltd. agreed to purchase from you your partnership interest in Carico Lake Mining Company. Demand is also made on you for return of the TEN THOUSAND DOLLAR ($10,000.00) down payment. The reason for this rescission is as follows:
>
> 1. You have made sales of turquoise to former Carico Lake customers in violation of Paragraph 4.j of the agreement.
>
> 2. In connection with the sale of your partnership interest, you grossly misrepresented the amount of the turquoise reserves which are located at the mining claims of Carico Lake Mining Company.
>
> 3. There are major discrepancies in the accounts payable and accounts receivable for an estimated diminution in the assets of the corporation of at least $7,447.96. (In accordance with Paragraph 6 of the Agreement, the personal guarantees of Joe Priestley and Charles Nuckols on the promissory note are hereby declared to be void.)
>
> 4. There is failure of consideration for the reason that Richard K. Mulvaney has not, and continues to refuse to accept Corona Ltd., as a partner.
>
> 5. In connection with the sale of your partnership interest to Corona, Ltd.,
>
> you violated the Federal Securities Act of 1933, the Securities and Exchange Act of 1934, the Rules and Regulations promulgated thereunder, and the Securities Act of New Mexico.
>
> For these and other reasons, Corona, Ltd., hereby returns to you your partnership interest in Carico Lake Mining Company, demands full refund of the TEN THOUSAND DOLLAR ($10,000.00) down payment, repudiates the promissory note executed in connection with the purchase agreement, and makes demand upon you for such other damages as may be provided by law in an additional amount of Ten Thousand Dollars ($10,000.00).

This notice to rescind was ineffective for two reasons. First, because it did not comply with the terms of the agreement as to notice. *Tomsheck v. Doran*, 126 Mont. 598, 256 P.2d 538, 543 (1953), quoting from Black on Recission and Cancellation of Contracts, 2d Ed., § 572, p. 1409, said "But when a particular form of notice, or *notice for a given length of time*, is stipulated for in the contract, exact compliance with it is necessary, and the giving of the prescribed notice is *absolutely an essential prerequisite* to the recission or cancellation of the contract * * * *"

[W]here the contractually defined method of termination of the contract is made exclusive by the terms of the contract, such contractually defined method of termination must be complied with in order for a termination of the contract to be valid and effective.

\* \* \* \* \* \*

In other words, it is not the breach itself that alone justifies the termination of the Agreement, but, under the terms of the Agreement, it is also the failure * * * to cure the breach after receipt of a notice setting forth contractually required information which, in conjunction with the breach, justifies termination. *Hubler Rentals, Inc. v. Roadway Express, Inc.*, 459 F.Supp. 564 (D.C.Maryland, 1978).

The purpose of notice of default in the usual case is to give the party allegedly in

default an opportunity to remedy the default and meet his obligation. *Wickahoney Sheep Company v. Sewell*, 273 F.2d 767 (9th Cir. 1959).

Second, this notice of rescission was not sent in behalf of Priestley and Nuckols. The opening sentence of that letter states who they were representing (Corona, Ltd.). No explanation is given in the letter by what authority they, the attorneys, could make the parenthetical statement in paragraph 3, "In accordance with Paragraph 6 of the Agreement, the personal guarantees of Joe Priestley and Charles Nuckols on the promissory note are hereby declared to be void". Granted that Priestley and Nuckols were the sole stockholders of Corona, Ltd., they are separate entities. *See Scott Graphics, Inc. v. Mahoney*, 89 N.M. 208, 549 P.2d 623 (Ct.App.1976).

It is my opinion that Priestley and Nuckols were parties to the agreement of February 18, 1977, and bound by all its terms and conditions. The notice was ineffective because it did not comply with the terms of the agreement, assuming arguendo that the attorneys had authority to act in behalf of Priestley and Nuckols. The trial court's findings in this regard were supported by substantial evidence.

I would affirm.